16-2021-CA-003120-XXXX-MA Div: CV-B

Filing # 128113419 E-Filed 06/04/2021 11:42:30 AM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO:

DIVISION:

3333 CANAL STREET, LLC,
A Florida Limited Liability Company,
        Plaintiff,

v.

ROOFING SUPPLY GROUP — TAMPA, LLC, a
Delaware Limited Liability Company,
and BEACON SALES ACQUISITION, INC.,
a Foreign Company,
        Defendants.
_____/

## COMPLAINT FOR DECLARATORY JUDGMENT REGARDING COMMERCIAL LEASE

Plaintiff 3333 CANAL STREET, LLC, a Florida Limited Liability Company ("3333" and "PLAINTIFF") sues defendants ROOFING SUPPLY GROUP — TAMPA, LLC, a Delaware Limited Liability Company ("ROOFING SUPPLY") and BEACON SALES ACQUISITION, INC. a Foreign Company ("BEACON") (Collectively, "Defendants") and alleges:

### GENERAL ALLEGATIONS

1. This is an action for declaratory relief within the jurisdiction of this court pursuant to Fla. Stat. §86.011, regarding a lease that exceeds $30,000 in value exclusive of interest, costs and attorneys' fees.

2. Venue is proper in Duval County, Florida as the real property at issue upon which the alleged Lease is located is located in Duval County, Florida.

3. Plaintiff owns the following described real property in Duval

1

ACCEPTED: DUVAL COUNTY, JODY PHILLIPS, CLERK, 06/07/2021 11:38:11 AM

County, Florida:  3333 Canal Street, Jacksonville, Florida 32207 (the "Property").

4. Plaintiff agreed to Lease a portion of the PROPERTY to ROOFING SUPPLY on or about July 26, 2013 (the "Premises"), pursuant to the GROSS LEASE AGREEMENT dated July 26, 2013 (the "GROSS LEASE AGREEMENT"). A copy of the GROSS LEASE AGREEMENT is attached as **Exhibit A**.

5. The Premises was expected to be approximately 50,000 square feet. The parties agreed to allow ROOFING SUPPLY to occupy approximately 83,000 square feet of space in the PROPERTY at the 50,000 square foot price for the first three years at a rate of approximately $3.31 per square foot. This rent was then increased by a certain factor per year.

6. The GROSS LEASE AGREEMENT was never assigned.

7. On or about July 20, 2016, the parties discussed revising the GROSS LEASE AGREEMENT. A letter of intent regarding the Lease was proposed on or about July 20, 2016 (the "JULY 20 LETTER"). A copy of the JULY 20 LETTER is attached as **Exhibit B**.

8. The JULY 20 LETTER was not witnessed by two witnesses and is therefore invalid as a lease agreement or lease renewal pursuant to Florida Statutes Section 689.01 (2016). Further, the JULY 20 LETTER was not signed by ROOFING SUPPLY or BEACON and is therefore invalid as ROOFING SUPPLY was the applicable

2

tenant in July of 2016.

9. The JULY 20 LETTER was not signed by the President, Vice President or Secretary of BEACON or ROOFING SUPPLY and is therefore invalid under Florida Statutes 692.01. The JULY 20 LETTER was signed by someone with the initials "JMP" in place of Ross D. Cooper. Ross D. Cooper was a vice president of BEACON, but was not an authorized person to sign on behalf of ROOFING SUPPLY.

10. In addition to invalidity, the JULY 20 LETTER is unenforceable because there is no mutuality of obligation inasmuch as ROOFING SUPPLY or BEACON are not bound by the defectively signed JULY 20 LETTER. Further, the JULY 20 LETTER fails for lack of consideration.

11. After July 20, 2016 the PLAINTIFF and ROOFING SUPPLY and BEACON did not follow the terms JULY 20 LETTER. That is the tenant at the Premises did not pay the rents set out in the JULY 20 LETTER.

12. As soon as PLAINTIFF realized the errors in the JULY 20 LETTER, PLAINTIFF notified ROOFING SUPPLY and BEACON that the JULY 20 LETER is invalid.

13. On or about January 22, 2019, PLAINTIFF/LANDLORD rejected the JULY 20 LETTER and proposed new terms for the GROSS LEASE AGREEMENT pursuant to a letter dated January 22, 2019 (the

"1/22/19 LETTER"). A copy of the 1/22/19 LETTER is attached as **Exhibit C.**

14. Pursuant to the 1/22/19 LETTER, PLAINTIFF threatened to file suit to determine the rents due unless ROOFING SUPPLY and BEACON paid more rents than those set out in the JULY 20 LETTER, and proposed that BEACON pay "$2.65/ s.f. gross starting February 2019 and stay fixed through your first term to 10-11-21".

15. BEACON and ROOFING SUPPLY accepted this proposal and began paying increased rents for the PROPERTY. PLAINTIFF agreed to forbear litigation in reliance on the increased payments.

16. BEACON and ROOFING SUPPLY failed to timely renew the GROSS LEASE AGREEMENT as required by the original term set out in the 2013 GROSS LEASE AGREEMENT.

17. On or about February 5, 2021 BEACON and ROOFING SUPPLY requested terms for a new lease. Plaintiff then on February 8, 2021 demanded increased rents and BEACON began paying the increased rents after February 2021. A Copy of the email regarding this is attached as **Exhibit D.**

18. Plaintiff as one party and BEACON and ROOFING SUPPLY as the other party are in doubt as to the terms of the GROSS LEASE AGREEMENT given the disparate payments and agreements made by the parties.

4

19. All conditions precedent to the bringing of this action have occurred, have been performed or have been waived.

**WHEREFORE,** Plaintiff respectfully requests the following relief:

A. Declaring the GROSS LEASE AGREEMENT was modified in January 2021 by the parties' conduct to increase rents to $2.65/s.f. gross on 87,200 square feet and ending on October 11, 2021; and

B. Declaring the GROSS LEASE AGREEMENT was not extended according to its terms and expires on October 11, 2021;

C. Declaring that the JULY 20 LETTER was void for failure of consideration or errors in execution and was superseded by the parties later agreements;

D. Awarding PLAINTIFF attorneys' fees and costs pursuant to the GROSS LEASE AGREEMENT and Florida law, and

E. Granting such further relief to plaintiff as this Court may deem proper in the premises.

ERIC S. KOLAR, P.A.

By: _____
Eric S. Kolar
Florida Bar No. 961220
4035 Atlantic Boulevard
Jacksonville, Florida 32207
(904) 396-0009
(904) 396-8700 (facsimile)
Attorneys for Plaintiff
Primary Email:
service@kolarlaw.com
Secondary: eric@kolarlaw.com
    And mk@kolarlaw.com

EXHIBIT  A

## GROSS LEASE AGREEMENT

THIS GROSS LEASE AGREEMENT (this "Lease") is made and entered into to be effective as of the Effective Date (as hereinafter defined) by and between 3333 Canal Street, LLC, a Florida limited liability company ("Landlord") and Roofing Supply Group – Tampa, LLC, a Delaware limited liability company ("Tenant").

1. **PREMISES AND TERM.** In consideration of the obligation of Tenant to pay rent as herein provided, and in consideration of the other terms, provisions and covenants hereof, Landlord hereby demises and leases to Tenant, and Tenant hereby accepts and leases from Landlord certain premises situated at 3333 Canal Street in Jacksonville, Duval County, Florida, referred to hereinafter as the "Premises", together with all rights, privileges, easements, appurtenances, and amenities belonging to or in any way pertaining to the Premises and together with the portions of the building and other improvements situated or to be situated upon the Premises occupied by Tenant hereunder. The Premises contain the real property described on Exhibit A attached hereto and incorporated herein by reference (the "Property"). The building situated upon the Property, which contains a total of approximately 123,050 square feet of warehouse and office space, shall be referred to hereinafter as the "Building". The parties acknowledge and agree that the Premises shall be deemed to include a total of approximately 83,800 square feet contained in the Building, inclusive of both warehouse and office space; and (b) one and one-half (1.5) acres of fenced storage yard. Landlord acknowledges that the Premises include, without limitation, six (6) dock doors measuring approximately 200' x 375', six (6) of which have dock shelters and dock levelers.

TO HAVE AND TO HOLD the Premises for a term commencing on the "Commencement Date", as hereinafter defined, and ending thirty-eight (38) months thereafter (the "Primary Term"); provided however, that in the event the Commencement Date is a date other than the first day of a calendar month, said term shall extend for said number of months in addition to the remainder of the calendar month following the Commencement Date.

A.    The Commencement Date shall be the later of August 12, 2013 or the date upon which Landlord delivers the Premises to Tenant with the Landlord's Work (hereinafter defined) substantially completed. Tenant acknowledges that, except with respect to latent defects and Landlord's representations and warranties set forth in Section 5B and Section 24E hereof, Tenant has inspected and accepts the Premises, and specifically the Building and improvements comprising the same, in their present "AS-IS" condition. Notwithstanding the foregoing, prior to the Commencement Date Tenant shall have the right of early access to, and to enter upon, any part of the Property that is not then under construction, to begin its move into the Premises in anticipation of commencing its business operations thereon, subject to the terms and conditions set forth in this Lease except for the covenants pertaining to the payment of Base Rental (the parties agreeing that no Base Rental shall be due hereunder until the Commencement Date).

B.    Subject to the condition that Tenant shall not, at the time of exercise of any renewal option hereunder, be in default (after the expiration of any notice and cure period to which Tenant may be entitled) of any of the terms, provisions or requirements of this Lease, Landlord hereby grants to Tenant the right and option to renew and extend the term of this Lease for two (2) renewal terms of three (3) years each (each a "Renewal Term"), with the Renewal Term to begin, as applicable, upon the expiration of the Primary Term or the expiration of the preceding Renewal Term. All of the other terms, provisions and covenants of this Lease shall apply to each Renewal Term; provided, that the Base Rental (as hereinafter defined) during each Renewal Term shall be as set forth in Section 2B and Section 2C below. Tenant shall exercise such option by delivering to Landlord written notice of Tenant's election to renew (an "Election Notice") no later than ninety (90) days prior to the expiration of the Primary Term or the expiration of the first Renewal Term, as applicable. The Primary Term and the Renewal Terms (if exercised) shall hereinafter collectively be referred to as the "Term". If Tenant does not exercise any renewal option hereunder by delivering an Election Notice within the time set forth above, then such renewal option shall thereupon terminate and be void and have no further force or effect.

2.    **RENT & SECURITY DEPOSIT.**

A.    Tenant agrees to pay to Landlord base rental ("Base Rental") for the Premises, in advance, without demand, deduction or set off (except as otherwise provided herein), for the entire Term hereof, as follows: (i) for the period commencing on August 12, 2013 and ending on October 31, 2013, $0.00 (i.e., Base Rental for such period shall be abated); and (ii) for each of the remaining full calendar months of the Primary Term commencing on November 1, 2013, Base Rental determined as follows:

- 1 -

| Full Mos. | Base Rental | TI Work | Total Monthly Base Rental | Annualized Base Rental |
|-----------|-------------|---------|---------------------------|------------------------|
| 3-14      | $12,500.00  | $1,304.00 | $13,804.00              | $165,684.00            |
| 15-26     | $12,875.00  | $1,304.00 | $14,179.00              | $170,148.00            |
| 27-38     | $13,261.25  | $1,304.00 | $14,562.25              | $174,783.00            |

One monthly installment of Base Rental shall be due and payable on the Effective Date hereof, which monthly installment shall be applied to the Base Rental payment due hereunder for the third full calendar month of the Primary Term, and beginning with the fourth full calendar month of the Primary Term a like monthly installment shall be due and payable on or before the first day of each calendar month during the Term, except that the Base Rental payment for any fractional calendar month at the commencement or end of the Lease period shall be prorated. The term "Rent" as may be used herein, includes Base Rental and any other additional amounts or rental which Tenant may be obligated to pay Landlord hereunder.

B.    The monthly Base Rental for the first Renewal Term shall be determined as follows.

| Full Mos. | Base Rental | TI Work | Total Monthly Base Rental | Annualized Base Rental |
|-----------|-------------|---------|---------------------------|------------------------|
| 39-50     | $13,659.09  | $121.11 | $13,780.20               | $165,362.40            |
| 51-62     | $14,068.86  | $121.11 | $14,189.97               | $170,269.64            |
| 63-74     | $14,490.93  | $121.11 | $14,612.04               | $175,344.48            |

C.    The monthly Base Rental for the second Renewal Term shall be determined as follows.

| Full Mos. | Base Rental | TI Work | Total Monthly Base Rental | Annualized Base Rental |
|-----------|-------------|---------|---------------------------|------------------------|
| 75-86     | $14,925.65  | $121.11 | $15,046.76               | $180,561.12            |
| 87-98     | $15,373.42  | $121.11 | $15,494.53               | $185,934.36            |
| 99-110    | $15,834.62  | $121.11 | $15,955.73               | $191,468.76            |

D.    Notwithstanding anything herein to contrary, the portion of the Total Monthly Base Rental set forth in Section 2A and Section 2B above attributable to Tenant Improvement Work to be performed by Landlord (i.e., "TI Work") shall be reduced accordingly should Landlord's total expenditure on such items be less than the total Tenant Allowance set forth on Exhibit B.

E.    A security deposit in the amount of $12,500.00 shall be due and payable by Tenant on the Effective Date hereof as security for the faithful performance and observation by Tenant of the terms, provisions and conditions of this Lease. It is agreed that in the event Tenant defaults, with respect to any of the terms, provisions and conditions of this Lease, including but not limited to, the payment of Rent, Landlord may use, apply or retain in whole or any party of the security so deposited to the extent required for the payment of Rent or any other sum as to which Tenant is in default or for any other sum which Landlord may expend or may be required to expend by reason of Tenant's default with respect to any terms, provisions and conditions of this Lease. In the event that Tenant shall fully and faithfully comply with all of the terms, provisions, and conditions of this Lease, the security shall be returned Tenant within thirty (30) days after the termination of this Lease and after delivery of the premises to Landlord.

3.    USE. The Premises shall be used only for the purpose of general warehouse and distribution (including interior parking of vehicles), light manufacturing and general office use, and for such other lawful purposes as may be incidental thereto. Outside storage, including without limitation, building materials, trucks, trailers and other vehicles, shall be permitted. Landlord represents and warrants that outside storage is permitted by the applicable zoning on the Premises and if at any time Tenant is prohibited by law or otherwise from using the Premises for outside storage, Tenant shall have the right to terminate the Lease. Tenant shall comply with all governmental laws, ordinances and regulations applicable to the use of the Premises, and shall promptly comply with all governmental orders and directives for the correction, prevention and abatement of nuisances in or upon, or connected with, the Premises, all at Tenant's sole expense.

4.    TAXES.

- 2 -

A.    Landlord agrees to pay before they become delinquent all taxes, assessments and governmental charges of any kind and nature whatsoever lawfully levied or assessed against the Property, including the Building and the grounds, storage yard, parking areas, driveways and alleys around the Building, but excluding income taxes levied on Landlord's net income (hereinafter collectively referred to as "Taxes").

B.    Tenant shall monthly pay to Landlord, as additional rental under this Lease, the amount of the Florida sales and use taxes due by Landlord as a result of Landlord's leasing of the Premises to Tenant.

C.    In addition to the foregoing, Tenant shall be responsible for the payment of any personal property taxes assessed against Tenant's personal property and inventories at the Premises.

###    5.    LANDLORD'S REPAIRS AND OBLIGATIONS.

A.    Landlord shall at its expense be responsible for the following: (i) Landlord shall be responsible for the maintenance and replacement of (a) the roof, foundation (including warehouse floors) and the structural soundness of the exterior walls of the Building; (b) the plumbing, electrical and other systems in the Building as a whole; (c) underground utilities and sewage line plumbing; and (d) the sprinkler system in the Building; and (ii) as between Tenant and Landlord, Landlord shall be responsible for the maintenance of any space in the Building that is occupied by Landlord or by any other tenant(s) of Landlord; and (iii) Landlord shall be responsible at its sole expense for the replacement of the heating and air conditioning systems servicing the Building, including the Premises (except to the extent that the necessity for such replacement arises as a result of damage caused by Tenant). Landlord agrees to maintain all of the foregoing in good repair, reasonable wear and tear excepted. The term "walls" as used herein shall not include windows, glass or plate glass, doors, store fronts or office entries.

B.    In addition, Landlord shall at its expense be responsible for the maintenance and replacement (as necessary) of the Common Areas, including without limitation the grounds, regularly performing the mowing of any grass, trimming, weed removal, snow removal, general landscape maintenance, common sewage line plumbing, common exterior lighting (if applicable), common dumpster removal (if applicable) and other exterior maintenance obligations of the Building, including but not limited to painting, the maintenance, repair and replacement of the parking areas, driveways, alleys and maintenance of the whole of the Property (except as noted above) in a clean and sanitary condition. For the purposes of this Lease, the term "Common Areas" means all areas, facilities and building systems that are provided and designated from time to time by Landlord for the general non-exclusive use and convenience of Tenant with other tenants and which are not leased or held for the exclusive use of a particular tenant. Common Areas may, but do not necessarily include, hallways, entryways, stairs, elevators, driveways, walkways, terraces, docks, loading areas, restrooms, trash facilities, parking areas and garages, roadways, pedestrian sidewalks, landscaped areas, security areas, lobby or mall areas, common heating, ventilating and air conditioning systems, common electrical service, equipment and facilities, and common mechanical systems, equipment and facilities. Landlord agrees to maintain the Common Areas in good repair, reasonable wear and tear excepted.

C.    Notwithstanding anything to the contrary in this Lease, (i) Landlord warrants that, as of the Commencement Date, the roof, plumbing, electrical and other systems in the Building as a whole (including without limitation the HVAC systems and equipment servicing the Premises, water, sewer, building standard interior lighting, fire sprinkler system, loading doors, loading equipment and building exterior walls) are in good working order and repair; (ii) that the paving is suitable for driving vehicles with up to 85,000 lbs of weight, and (iii) to the extent that any of the items listed in the foregoing clause (i) are not otherwise the responsibility of Landlord under Section 5A above, Landlord warrants and shall maintain at Landlord's cost and expense such items in good working order and repair (including replacements) for a period of six (6) months from and after the Commencement Date, except for the HVAC systems and equipment servicing the Premises, which Landlord warrants and shall maintain at Landlord's cost and expense in good working order and repair (including replacements) for a period of two (2) years from and after the Commencement Date.

###    6.    TENANT'S REPAIRS AND OBLIGATIONS.

A.    Tenant shall at its sole cost and expense keep and maintain all parts of the Premises (except those for which Landlord is expressly responsible under the terms of this Lease) in good condition, promptly making all repairs,

repainting, and replacements, including but not limited to, windows, glass and plate glass, doors, any office entries, interior walls and finish work, floors and floor covering, dock levelers, truck doors and dock bumpers. Tenant shall not be obligated to repair any damage caused by fire, tornado or other casualty covered by the insurance to be maintained by Landlord pursuant to Section 12A below.

B.   At the termination of this Lease, Tenant shall deliver up the Premises to Landlord in as good condition as at the Commencement Date, ordinary wear and tear and condemnation or casualty loss excepted. In addition, Tenant shall have removed any Alterations (as hereinafter defined) that are required to be removed pursuant to Section 7B hereof.

7.   LANDLORD'S WORK/TENANT ALLOWANCE/ALTERATIONS.

A.   Landlord shall perform the work set forth on Exhibit B ("Landlord's Work") in a good and workmanlike manner and in compliance with all applicable laws on or before August 12, 2013 (the "Delivery Date"). If Landlord fails to deliver the Premises to Tenant with the Landlord's Work substantially complete, subject only to minor punchlist items, on or before the Delivery Date, Tenant shall receive a day for day abatement of Rent until such time as delivery described above occurs and such rental abatement shall be applied to the period beginning on the third month of the Lease.

B.   Except as otherwise set forth herein, Tenant will not make, or cause or permit to be made, any additions, alterations, installations or improvements in or to the Premises (singularly an "Alteration" and collectively "Alterations") without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Unless Landlord has waived this requirement in writing, together with Tenant's request for approval of any Alteration, Tenant must also submit details with respect to the design concept, plans and specifications. In the event that Landlord fails to disapprove any Alteration to the Premises proposed by Tenant within ten (10) days after receipt of a written proposal therefor from Tenant, Landlord shall be deemed to have consented to such Alteration. In the event Landlord consents, or is deemed to have consented, to the making of any such Alterations by Tenant, the same shall be made by Tenant, at Tenant's sole cost and expense, in accordance with all applicable laws, ordinances and regulations. Notwithstanding the foregoing, Tenant may make non-structural, interior Alterations to the Premises without Landlord's consent provided (i) such Alterations will not be visible from outside the Premises; (ii) such Alterations will not adversely affect the structure or systems of the Building; (iii) such Alterations will not violate any applicable laws, ordinances or regulations; (iv) the cost of such Alterations does not exceed Fifty Thousand Dollars ($50,000.00) in any single instance; and (v) Tenant secures all permits, licenses and approvals required to construct and/or install such Alterations. Nothing herein shall prohibit Tenant from installing a security system, including cameras, lighting and satellite dishes as it deems appropriate for the security of its business.

C.   All Alterations erected by Tenant shall be and remain the property of Tenant during the Term of this Lease, and such alterations, additions, improvements and partitions shall become the property of Landlord as of the date of termination of this Lease or upon earlier vacating of the Premises and shall be delivered up to Landlord with the Premises. Notwithstanding the foregoing sentence, all shelves, bins, machinery, security equipment and trade fixtures installed by Tenant may be removed by Tenant prior to the termination of this Lease if Tenant so elects, and shall be removed by the date of termination of this Lease or upon earlier vacating of the Premises if required by Landlord. In addition, at Landlord's election Tenant shall remove (i) any Alterations constructed by Tenant without Landlord's consent, and (ii) any Alterations with respect to which Landlord's consent was required hereunder and Landlord conditioned its consent upon Tenant's removal of such Alterations upon Tenant's vacating of the Premises. Upon any such removal described in the foregoing sentences, Tenant shall repair any damage caused by such removal. All such removals and repairs shall be accomplished in a good workmanlike manner so as not to damage the primary structure or structural qualities of the Building and other improvements situated on the Property.

8.   SIGNS. Tenant shall have the right at its sole expense to install exterior signage on the front door and the front of the Premises, subject to applicable building and signage codes, historic guidelines, but otherwise without the need to obtain Landlord's consent thereto. In addition, Tenant shall have the right to construct a pylon or monument sign, subject to applicable building and signage codes, historic guidelines, but otherwise without the need to obtain Landlord's consent thereto. Tenant shall not erect any sign over the public way. Landlord shall cooperate fully with Tenant in obtaining any approvals required by applicable laws, but Landlord shall not be required to incur any expense in connection therewith. On or before the expiration or

-- 4 --

earlier termination of this Lease, Tenant shall remove all signs thus erected (except any pylon or monument structure, if built), and shall repair any damage or disfigurement, and close any holes, caused by such removal.

9. **INSPECTION AND RIGHT OF ENTRY.** Landlord and Landlord's agents and representatives shall have the right to enter the Premises at any time in the event of an emergency and to enter and inspect the Premises at any reasonable time during business hours with at least 24 hours prior notification, for the purpose of ascertaining the condition of the Premises or in order to make such repairs as may be required or permitted to be made by Landlord under the terms of this Lease. During the period that is six (6) months prior to the end of the Term hereof, Landlord and Landlord's agents and representatives shall have the right to enter the Premises at any reasonable time during business hours with at least 24 hours prior notification for the purpose of showing the Premises.

10. **UTILITIES.** Landlord agrees to provide at its cost water, electricity and gas (when applicable) service connections into the Premises in accordance with the specifications, if any, attached hereto. Tenant shall pay for all water, gas, heat, light, power, telephone, sewer, sprinkler charges and other utilities and services used on or from the Premises, together with any taxes, penalties, surcharges or the like pertaining thereto, and any maintenance charges for utilities as provided in this Section 10, and shall furnish all electric light bulbs and tubes (not including Common Areas or portions of the Building not leased to Tenant). With respect to any utility and/or service that is usable in common among Tenant and any other tenants/potential tenants of the Building and which is not separately metered (the "Common Utility Charges"):

 (A) Landlord shall be responsible for (i) monthly notifying Tenant of (and providing evidence of) the total amount of the Common Utility Charges due for the preceding month and (ii) timely paying all Common Utility to the applicable service provider; and

 (B) Tenant shall be responsible for paying to Landlord 68.1% of such Common Utility Charges within ten (10) days of Tenant's receipt from Landlord of the required notice and evidence of the total Common Utility Charges.

Except as otherwise set forth herein or as a result of Landlord's failure to pay the Common Utility Charges, Landlord shall in no event be liable for any interruption or failure of utility services on the Premises; provided, however, that Landlord shall attempt not to disrupt Tenant's operations in the Premises during the exercise of any of Landlord's rights or obligations under this Lease, and will use commercially reasonable efforts to minimize any disruption of Tenant's business operations as a result thereof. Notwithstanding anything to the contrary herein, in the event that Tenant is prevented from using, and does not use, the Premises or any portion thereof, for five (5) consecutive days or fifteen (15) business days in any twelve (12) month period (the "Eligibility Period") as a result of (a) the negligence or willful misconduct of Landlord or any party for whom Landlord is responsible, (b) any repair, maintenance or alteration performed by Landlord after the Commencement Date, which substantially interferes with Tenant's use of the Premises, the parking facilities and/or the Building, (c) any failure by Landlord to provide Tenant with services or access to the Premises and/or the Building, or (d) because of the presence of Hazardous Materials (as hereinafter defined) in, on or around the Premises or the Building (but not placed there by Tenant or its employees or agents) which could pose a health risk to occupants of the Premises, then Tenant's Rent hereunder shall be abated or reduced, as the case may be, after expiration of the Eligibility Period for such time that Tenant continues to be so prevented from using, and does not use, the Premises or a portion thereof, in the proportion that the rentable area of the portion of the Premises that Tenant is prevented from using, and does not use, bears to the total rentable area of the Premises. However, in the event that Tenant is prevented from conducting, and does not conduct, its business in any portion of the Premises for a period of time in excess of the Eligibility Period, and the remaining portion of the Premises is not sufficient to allow Tenant to effectively conduct its business therein, and if Tenant does not conduct its business from such remaining portion, then for such time after expiration of the Eligibility Period during which Tenant is so prevented from effectively conducting its business therein, the Rent hereunder for the entire Premises shall be abated; provided, however, if Tenant reoccupies and conducts its business from any portion of the Premises during such period, the rent allocable to such reoccupied portion, based on the proportion that the rentable area of such reoccupied portion of the Premises bears to the total rentable area of the Premises, shall be payable by Tenant from the date such business operations commence. If Tenant's right to abatement occurs because of damage or destruction to the Premises, the Building and/or Tenant's property, Tenant's abatement period shall continue until Tenant has been given sufficient time, and sufficient access to the Premises and/or the Building, to rebuild such portion it is required to rebuild, to install its property, furniture, fixtures, and equipment to the extent the same shall have been removed and/or damaged as a result of such damage or destruction and re-open its operations at the Premises. To the extent Tenant has prepaid its monthly installment of Base Rental (as it does each month since each such monthly installment is due on the first

- 5 -

day of each month) and Tenant is subsequently entitled to an abatement, such prepaid (and subsequently abated) Base Rental shall be refunded to, and paid by Landlord to, Tenant within thirty (30) days after the end of the appropriate month.

### 11.    ASSIGNMENT AND SUBLETTING.

A.    Tenant shall not sell, assign, encumber or otherwise transfer by operation of law or otherwise, this Lease or any interest herein, sublet the Premises or any portion thereof, or suffer any other person to occupy or use the Premises or any portion thereof, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, nor shall Tenant permit any lien to be placed on the Tenant's interest by operation of law. Tenant shall, by written notice, advise Landlord of its desire from and after a stated date (which shall not be less than ten (10) days nor more than thirty (30) days after the date of Tenant's notice) to sublet the Premises or any portion thereof for any part of the Term thereof. Said notice by Tenant shall state the name and address of the proposed subtenant. If Landlord fails to deny in writing, Tenant's request for an assignment or sublease within ten (10) days of Tenant's request therefor, Landlord's consent to such assignment or sublease shall be deemed granted.

B.    Any assignment or subletting hereunder by Tenant shall not result in Tenant being released or discharged from any liability under this Lease. As a condition to Landlord's prior written consent as provided for in Section 11A above, the assignee or subtenant or subtenants shall agree in writing to comply with and be bound by all of the terms, covenants, conditions, provisions and agreements of this Lease, and Tenant shall deliver to Landlord promptly after execution, an executed copy of each assignment or sublease and an agreement of said compliance by each assignee or sublessee.

C.    Landlord's consent to any sale, assignment, encumbrance, subletting, occupation, lien or other transfer shall not release Tenant from any of Tenant's obligations hereunder or be deemed to be a consent to any subsequent occurrence. Any sale, assignment, encumbrance, subletting, occupation, lien or other transfer of this Lease which does not comply with the provision of this Section 11 shall be null and void.

D.    Notwithstanding anything to the contrary contained herein, provided Tenant gives Landlord written notice of such assignment or subletting, Tenant may assign or sublet the Lease, without the consent of Landlord, to a partnership of which Tenant is a general partner, or any entity controlled by, under common control with, or controlling Tenant or to any successor in interest to all or substantially all of the assets or ownership interests of Tenant, whether by merger, consolidation or otherwise, provided (i) such entity shall not use the Premises for any purpose that is not permitted under Section 3 hereof; and (ii) such entity expressly assumes the Tenant's obligations under this Lease. To the extent that Tenant enters into an assignment of the Lease or enters into a sublease for all or any portion of the Premises, Landlord shall also simultaneously execute and deliver a recognition agreement pursuant to which Landlord shall agree that in the event Tenant defaults under the Lease and the Lease is terminated, the assignment or the sublease shall be recognized as a direct lease between Landlord and the assignee or the subtenant on the terms and conditions of the assignment or sublease to the extent same are not inconsistent with, or contrary to, the provisions of the Lease and at a rental rate which is the higher of the rental rate under the Lease or the rental rate under the assignment or sublease. In addition, Tenant may allow any person or company which is a client or customer of Tenant or which is providing service to Tenant or one of Tenant's clients to occupy certain portions of the Premises without such occupancy being deemed an assignment or subleasing as long as no new demising walls are constructed to accomplish such occupancy and as long as such relationship was not created as a subterfuge to avoid the obligations otherwise set forth herein.

### 12.    FIRE AND CASUALTY DAMAGE.

A.    Landlord agrees to maintain insurance covering the Building of which the Premises are a part in an amount not less than one hundred percent (100%) of the replacement cost thereof, insuring against the perils of Fire, Lightning, Wind, Extended Coverage, Vandalism and Malicious Mischief, extended by Special Extended Coverage
Endorsement to insure against all other Risks of Direct Physical Loss, such coverages and endorsements to be as defined, provided and limited in the standard bureau forms prescribed by the insurance regulatory authority for the state in which the Premises are situated for use by insurance companies admitted in such state for the writing of such insurance on risks located within such state. Within thirty (30) days of the Commencement Date, Landlord shall

- 6 -

provide Tenant a certificate of insurance evidencing such policies and upon Tenant request thereafter but no more frequently than once per twelve (12) month period.

B.     If the Building situated upon the Property should be damaged or destroyed by fire, tornado or other casualty, Tenant shall give prompt written notice thereof to Landlord.

C.     If the Building situated upon the Property should be totally destroyed by fire, tornado or other casualty, or if the Building should be so damaged thereby that rebuilding or repairs cannot in Landlord's reasonable estimation be completed within one hundred eighty (180) days after the date upon which Landlord is notified by Tenant of such damage, this Lease shall terminate and the Rent hereunder shall be abated during the unexpired portion of this Lease, effective upon the date of the occurrence of such damage.

D.     If the Building situated upon the Property should be damaged by any peril covered by the insurance to be provided by Landlord under Subsection 12A above, but only to such extent that rebuilding or repairs can in Landlord's reasonable estimation be completed within one hundred eighty (180) days after the date upon which Landlord is notified by Tenant of such damage, this Lease shall not terminate, and Landlord shall at its sole cost and expense thereupon proceed with reasonable diligence to rebuild and repair the Building to substantially the condition in which it existed prior to such damage, except that Landlord shall not be required to rebuild, repair or replace any part of the partitions, fixtures, additions and other improvements which may have been placed in, on or about the Premises by Tenant. If any damage occurs within last year of the then existing Lease Term, either party may elect to terminate the Lease. However, if Landlord elects to terminate the Lease and Tenant has not exercised its Renewal Option, but the time frame for doing so has not expired, Tenant shall have thirty (30) days from receipt of Landlord's notice of termination, to elect to renew the Lease. If Tenant exercises its right to renew the Lease within the thirty (30) day period provided, Landlord's termination shall be null and void, and Landlord shall be required to rebuild the Premises in accordance with this Section. If the Premises are untenantable in whole or in part following such damage, the Rent payable hereunder during the period in which they are untenantable shall be reduced to such extent as may be fair or reasonable under all of the circumstances. In the event that Landlord should fail to complete such repairs and rebuilding within one hundred (180) days after the date upon which Landlord is notified by Tenant of such damage, Tenant may at its option terminate this Lease by delivering written notice of termination to Landlord as Tenant's exclusive remedy (except for rental abatements as provided above), whereupon all rights and obligations hereunder shall cease and terminate. In addition, if any portion of the Premises should be destroyed by a fire or any other casualty and the repairs thereto are not reasonably expected to be completed within one hundred eighty (180) days thereafter, Tenant shall have the right and option to terminate this Lease by written notice to Landlord within thirty (30) days after such fire or other casualty, as Tenant's exclusive remedy (except for rental abatements as provided above), whereupon all rights and obligations hereunder shall cease and terminate.

E.     Each of Landlord and Tenant hereby releases the other from any loss or damage to property caused by fire or any other perils insured in policies of insurance covering such property, even if such loss or damage shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible; provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such times as the releasor's policies shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasor to recover thereunder and then only to the extent of the insurance proceeds payable under such policies. Each of the Landlord and Tenant agrees that it will request its insurance carriers to include in its policies such a clause or endorsement. If extra cost shall be charged therefore, each party shall advise the other thereof and of the amount of the extra cost, and the other party, at its election, may pay the same, but it shall not be obligated to do so.

13.    LIABILITY.

A.     Landlord shall not be liable to Tenant or Tenant's employees, agents, patrons or visitors, or to any other person whomsoever, for any injury to person or damage to property on or about the Premises, resulting from and/or caused in part or whole by the negligence or misconduct of Tenant, its agents, servants or employees. TENANT HEREBY COVENANTS AND AGREES THAT IT WILL AT ALL TIMES INDEMNIFY AND HOLD HARMLESS THE LANDLORD AND ITS AGENTS AND EMPLOYEES FROM ANY LOSS, LIABILITY, CLAIMS, SUITS, COSTS, EXPENSES, INCLUDING

- 7 -

WITHOUT LIMITATION REASONABLE ATTORNEY'S FEES AND DAMAGES, RESULTING FROM AND/OR CAUSED IN PART OR WHOLE BY THE NEGLIGENCE OR WILLFUL MISCONDUCT OF TENANT OR ITS AGENTS, SERVANTS OR EMPLOYEES; PROVIDED, HOWEVER, THAT THE FOREGOING INDEMNITY SHALL NOT IN ANY EVENT APPLY TO INJURY TO PERSONS OR DAMAGE TO PROPERTY CAUSED BY OR ARISING OUT OF (i) THE BREACH OF THIS LEASE BY LANDLORD, (ii) THE BREACH OF ANY REPRESENTATION OR WARRANTY MADE BY LANDLORD IN THIS LEASE, OR (iii) THE NEGLIGENCE OR WILLFUL MISCONDUCT OF LANDLORD OR ITS AGENTS, EMPLOYEES OR CONTRACTORS, OR THIRD PARTIES LEASING FROM LANDLORD.

B.      Tenant shall not be liable to Landlord or Landlord's employees, agents, patrons or visitors, or to any other person whomsoever, for any injury to person or damage to property on or about the Premises, resulting from and/or caused in part or whole by the negligence or willful misconduct of Landlord or its agents, servants or employees or third parties leasing from Landlord. LANDLORD HEREBY COVENANTS AND AGREES THAT IT WILL AT ALL TIMES INDEMNIFY AND HOLD SAFE AND HARMLESS THE TENANT AND ITS AGENTS AND EMPLOYEES FROM ANY LOSS, LIABILITY, CLAIMS, SUITS, COSTS, EXPENSES, INCLUDING WITHOUT LIMITATION REASONABLE ATTORNEY'S FEES AND DAMAGES, ARISING OUT OF OR RELATING TO ANY SUCH DAMAGE OR INJURY; PROVIDED, HOWEVER, THAT THE FOREGOING INDEMNITY SHALL NOT IN ANY EVENT APPLY TO INJURY TO PERSONS OR DAMAGE TO PROPERTY CAUSED BY OR ARISING OUT OF (i) THE BREACH OF THIS LEASE BY TENANT, OR (ii) THE NEGLIGENCE OR WILLFUL MISCONDUCT OF TENANT OR ITS AGENTS, EMPLOYEES OR CONTRACTORS.

C.      Tenant shall, at all times during the Term and at Tenant's sole expense, obtain and keep in force commercial general liability insurance, including contractual liability, on an "occurrence" policy form, with a minimum combined single limit in the amount of (i) $500,000 per occurrence for bodily or personal injury to, illness of, or death of persons ($1,000,000 aggregate if written as a combined single limit) and (ii) $100,000 per occurrence for damage to property occurring in, on or about the Premises. Such insurance shall name Landlord, and any other parties designated by Landlord, as additional insureds. Limits may be evidenced under a separate general liability policy or by combination of a general liability and umbrella policy. Certificates of such policies shall be delivered to Landlord on or before the Commencement Date of this Lease and upon Landlord's request thereafter but no more frequently than once per twelve (12) month period.

14.     CONDEMNATION.

A.      If the whole Premises should be taken for any public or quasi-public use under governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof, this Lease shall terminate and the Rent payable hereunder shall be abated during the unexpired portion of this Lease, effective when the physical taking of said Premises shall occur.

B.      If part of the Premises should be taken for any public or quasi-public use under governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof, and the taking would prevent or materially interfere with the use of the Premises for the purpose for which they are being used as determined by Tenant in its sole and absolute discretion, Tenant may terminate this Lease and the Rent payable hereunder shall be abated during the unexpired portion of this Lease, effective when the physical taking of said Premises shall occur.

C.      If part of the Premises shall be taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof, and this Lease is not terminated as provided in Section 14B above, this Lease shall not terminate but the Rent payable hereunder during the unexpired portion of this Lease shall be reduced to such extent as may be fair and reasonable under all of the circumstances.

D.      All compensation awarded for any taking (or the proceeds of private sale in lieu thereof) of the Premises, the Building or other improvements, or any part thereof, shall be the property of Landlord and Tenant hereby assigns its interest in any such award to Landlord; provided, however, Landlord shall have no interest in any award made to Tenant for loss of business or for the taking of Tenant's fixtures and improvements if a separate award for such items is made to Tenant.

15.     HOLDING OVER. Tenant will, at the termination of this Lease by lapse of time or otherwise, yield up immediate possession to Landlord with all repairs and maintenance required herein to be performed by Tenant

- 8 -

completed. If Tenant holds over after the expiration or termination of this Lease, unless the parties hereto otherwise agree in writing on the terms of such holding over, the hold over tenancy shall be subject to termination by either party upon not less than thirty (30) days advance written notice, and all of the other terms and provisions of this Lease shall be applicable during that period, except that Tenant shall pay Landlord from time to time upon demand, as rental for the period of any hold over, an amount equal to 125% of the Base Rental in effect on the termination date, computed on a daily basis for each day of the hold over period. No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided. In no event shall Tenant be liable for any other damages, including special, punitive or consequential relating to any holdover and Landlord expressly agreeing that the holdover Base Rental adequately compensates Landlord for any damages which it may incur.

16.    QUIET ENJOYMENT. Landlord covenants that it now has, or will acquire before Tenant takes possession of the Premises, good title to the Property, free and clear of all liens and encumbrances, excepting only the lien for current taxes not yet due, such mortgage or mortgages as are permitted by the terms of this Lease, zoning ordinances and other building and fire ordinances and governmental regulations relating to the use of such property, and easements, restrictions and other conditions of record. Landlord represents and warrants that it is the owner of fee title to the Property with full right and authority to enter into this Lease and that Tenant, upon paying the Rent herein set forth and performing its other covenants and agreements herein set forth, shall peaceably and quietly have, hold and enjoy the Premises for the Term hereof without hindrance or molestation from Landlord or any other person claiming by or through Landlord, subject to the terms and provisions of this Lease.

17.    EVENTS OF DEFAULT. The following events shall be deemed to be events of default by Tenant under this Lease:

A.    Tenant shall fail to pay any installment of the Rent herein reserved when due, or any other payment of reimbursement to Landlord required herein when due, and such failure shall continue for a period of ten (10) days after Tenant's receipt of Landlord's written notice of such failure; or

B.    Tenant shall fail to comply with any term, provision or covenant of this Lease (other than the foregoing in this Section 17), and shall not cure such failure within thirty (30) days after Tenant's receipt of Landlord's written notice of such failure; provided, however, that if the failure is of such a nature as to be impossible to be cured by the end of such thirty-day period, the thirty-day period shall be extended for the number of days reasonably required to cure same, so long as Tenant initiates its curative efforts within said thirty-day period and diligently pursues such curative efforts to completion.

18.    REMEDIES.

A.    Upon each occurrence of any event of default, Landlord shall have the option to pursue any one or more of the following remedies without any notice or demand:

      (1)    Terminate this Lease; and/or

      (2)    Enter upon and take possession of the Premises with or without terminating this Lease; and/or

      (3)    Alter all locks and other security devices at the Premises with or without terminating this Lease, and pursue, at Landlord's option, one or more remedies pursuant to this Lease, Tenant hereby specifically waiving any state or federal law to the contrary; and in any such event Tenant immediately shall surrender its Premises to Landlord, and if Tenant fails to do so, Landlord, without waiving any other remedy it may have, may enter upon and take possession of the Premises or any part thereof by force if necessary, without being liable for prosecution or any claim of damages therefor.

B.    In the event Tenant fails to pay any installment of Rent or additional rental hereunder within ten (10) days after the same is due, to help defray the additional cost to Landlord for processing such late payments, Tenant shall pay to Landlord on demand a late charge in an amount equal to $250.00; and the failure to pay such amount within

five (5) business days after demand therefor shall be an event of default hereunder. The provision for such late charge shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.

C.    Exercise by Landlord of any one or more remedies hereunder granted or otherwise shall not be deemed to be an acceptance of surrender of the Premises by Tenant, whether by agreement or by operation of law, it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant. No such alteration of locks or other security devices and no removal or other exercise of dominion by Landlord over the property of Tenant or others at the Premises shall be deemed unauthorized or constitute a conversion, Tenant hereby consenting, after any event of default to the aforesaid exercise of dominion over Tenant's property within the Premises. All claims for damages by reason of such re-entry and/or repossession and/or alteration of locks or other security devices are hereby waived, as are all claims for damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process. Tenant agrees that any re-entry by Landlord may be pursuant to judgment obtained in forcible detainer proceedings or other legal proceedings or without the necessity for any legal proceedings, as Landlord may elect; and Landlord shall not be liable for trespass or otherwise.

D.    In the event that Landlord elects to repossess the Premises without terminating the Lease, or in the event Landlord elects to terminate the Lease, then Tenant, at Landlord's option, shall be liable for and shall pay to Landlord, at the address specified for notice to Landlord herein, all rental and other indebtedness accrued to the date of such repossession, plus rental required to be paid by Tenant to Landlord during the remainder of the Lease term until the date of expiration of the term as stated in Section 1 hereof diminished by any net sums thereafter received by Landlord through reletting the Premises during said period (after deducting expenses incurred by Landlord as provided in Subsection 18E below). In no event shall Tenant be entitled to any excess of any rental obtained by letting over and above the rental herein reserved, but such amounts shall be applied to future amounts owed by Tenant. In no event shall Landlord be entitled to accelerate the Rent. Actions to collect amounts due by Tenant to Landlord under this Subsection may be brought from time to time, on one or more occasions, without the necessity of Landlord's waiting until expiration of the Lease term.

E.    In case of any event of default or breach by Tenant, Tenant shall also be liable for and shall pay to Landlord, at the address specified for notice to Landlord herein, in addition to any sum provided to be paid above, reasonable attorney's fees incurred by Landlord in connection with reletting the whole or any part of the Premises; the reasonable costs of removing and storing Tenant's or the occupant's property; the reasonable costs of repairing the Premises; and all reasonable expenses incurred by Landlord in enforcing or defending Landlord's rights and/or remedies.

F.    If Tenant should fail to make any payment or cure any default hereunder within the time herein permitted, Landlord, without being under any obligation to do so and without thereby waiving such default, may make such payment and/or remedy such other default for the account of Tenant (and enter the Premises for such purpose), and thereupon Tenant shall be obligated to, and hereby agrees to pay Landlord upon demand, all costs, expenses and disbursements (including reasonable attorney's fees) reasonably incurred by Landlord in taking such remedial action.

G.    In the event of any event of default by Tenant under this Lease, Landlord shall use commercially reasonable efforts to mitigate its damages.

19.    **WAIVER OF LANDLORD'S LIEN.** Landlord hereby waives any and all landlord's liens, statutory and otherwise, that may otherwise exist in its favor with respect to this Lease.

20.    **MORTGAGES.**

A.    Subject to an SNDA (hereinafter defined) acceptable to Tenant, Tenant accepts this Lease subject and subordinate to any mortgage(s) and/or deed(s) of trust now or at any time hereafter constituting a lien or charge upon the Premises or the improvements situated thereon, provided however, that if the mortgagee, trustee, or holder of any such mortgage or deed of trust elects to have Tenant's interest in this Lease superior to any such instrument, then by notice to Tenant from such mortgagee, trustee or holder, this Lease shall be deemed superior to such lien, whether this Lease was executed before or after said mortgage or deed of trust. All mortgages or deeds of trust referred to in this Subsection 20A refer to any mortgages or deeds of trust.

- 10 -

B.    Notwithstanding the provisions of the foregoing Subsection 20A, it shall be a condition to Tenant's agreement to the provisions of said Subsection 20A that any lender, mortgagee, ground lessor or other party with superior interest in the Property (each a "Mortgagee") execute and deliver to Tenant a Subordination, Non-Disturbance and Attornment Agreement (an "SNDA") in a form agreeable to Tenant, which shall include provisions which state that (i) so long as Tenant is not in default under this Lease beyond any applicable notice and cure period, (a) Tenant's right of possession of the Premises and Tenant's rights arising out of this Lease shall not be affected or disturbed by any Mortgagee in the exercise of any of its rights under its mortgage or ground lease, (ii) such Mortgagee be subject to the offset rights of Tenant hereunder, and (c) Tenant shall not be joined in any foreclosure proceeding by such holder; and (ii) in the event that any Mortgagee acquires title to and/or the right to possession of the Premises pursuant to the exercise of any remedy provided for in a mortgage, or pursuant to termination of a ground lease, or under the law of the State of Florida, this Lease shall not be terminated or affected by such acquisition of title and/or right to possession, regardless whether it is by foreclosure, by sale resulting from any such proceeding, by termination of a ground lease, or otherwise, and Landlord hereby covenants that any such sale of and/or right to possession of the Premises pursuant to the exercise of any such rights and remedies shall be made subject to this Lease and the rights of Tenant hereunder; provided, however, that Tenant shall attorn to such mortgage, ground lessor or other person as its new Landlord, and this Lease shall continue in full force and effect as a direct Lease between the Tenant and such mortgagee, ground lessor or other person upon all the terms, covenants, conditions and agreements set forth herein.

C.    In addition, Landlord shall, simultaneously with the execution of this Lease, execute and deliver to Tenant the Landlord's Waiver attached hereto as **Exhibit C** (the "Landlord Waiver"). If Landlord fails to deliver the Landlord Waiver, Tenant may terminate this Lease at any time.

21.    **LANDLORD'S DEFAULT.** In the event Landlord should become in default in any payments due on any such mortgage described in Section 20 hereof or in the payment of Taxes or any other items which might become a lien upon the Premises and which Tenant is not obligated to pay under the terms and provisions of this Lease, Tenant is authorized and empowered after giving Landlord five (5) days prior written notice of such default and Landlord's failure to cure such default, to pay any such items for and on behalf of Landlord, and the amount of any item so paid by Tenant for or on behalf of Landlord, together with any interest or penalty required to be paid in connection therewith, shall be payable on demand by Landlord to Tenant; provided however, that Tenant shall not be authorized and empowered to make any payment under the terms of this Section 21 unless the item paid shall be superior to Tenant's interest hereunder. In the event Tenant pays any mortgage debt in full, in accordance with this paragraph, it shall, at its election, be entitled to the mortgage security by assignment or subrogation. In addition, in the event Landlord fails to perform any of Landlord's Lease-related obligations (other than those set forth in the preceding sentence) within thirty (30) days after written notice of such failure from Tenant or, if such performance cannot reasonably be completed within such period, to commence and diligently prosecute the performance of any such obligation during such period and to complete the same within a commercially reasonable period of time after the expiration of such initial period, Landlord shall be in default and Tenant, in addition to any other right or remedy it may have at law or in equity, shall have the right, but not the obligation, (a) to terminate this Lease by written notice to Landlord, or (b) to perform Landlord's obligation(s) on behalf of and at the sole cost and expense of Landlord. In the event Tenant elects to perform any obligation of Landlord pursuant to subpart (b) of the preceding sentence, Tenant shall promptly render a bill to Landlord for the reasonable cost of such performance, and Landlord covenants and agrees to reimburse Tenant for all such amounts within ten (10) days after Landlord's receipt thereof. In the event Landlord fails to reimburse Tenant for any sums expended by Tenant for its cure of Landlord's default within the appropriate time period, Tenant shall have the right to offset such amounts and interest at the interest rate of 12% per annum or the highest rate permitted by law, whichever is the lesser, against the next payment(s) of Rent then due and owing, until the amounts are reimbursed to Tenant in full. Notwithstanding anything herein or elsewhere in this Lease to the contrary, in the event of an emergency or any other problem requiring immediate attention in order to prevent further damage or injury, Tenant shall have the right to perform any Lease-related obligation of Landlord and Landlord shall reimburse to Tenant the reasonable cost thereof pursuant to the terms of the preceding sentence; provided, however, Tenant shall have made reasonably diligent efforts (under the circumstances) to notify and secure a commitment from Landlord to promptly perform its subject obligation.

22.    **MECHANICS LIENS.** Tenant shall have no authority, express or implied, to create or place any lien or encumbrance of any kind or nature whatsoever upon, or in any manner to bind the interests of Landlord in the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those

- 11 -

who may furnish materials or perform labor for any construction or repairs, and each such claim shall affect and each such lien shall attach to, if at all, only the Leasehold interest granted to Tenant by this instrument. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises on which any lien is or can be validly and legally asserted against its Leasehold interest in the Premises or the improvements thereon and that it will save and hold Landlord harmless from any and all loss, cost or expense based on or arising out of asserted claims or liens against the Leasehold estate or against the right, title and interest of the Landlord in the Premises or under the terms of this Lease. Tenant agrees to give Landlord prompt written notice if any lien or encumbrance is placed on the Premises.

23.     NOTICES. Each provision of this instrument or of any applicable governmental laws, ordinances, regulations and other requirements with reference to the sending, mailing or delivery of any notice or the making of any payment by Landlord to Tenant or with reference to the sending, mailing or delivery of any notice or the making of any payment by Tenant to Landlord shall be deemed to be complied with when and if the following steps are taken:

A.     All Rent and other payments required to be made by Tenant to Landlord hereunder shall be payable to Landlord at the address hereinbelow set forth or at such other address as Landlord may specify from time to time by written notice delivered in accordance herewith. Tenant's obligations to pay Rent and any other amounts to Landlord under the terms of this Lease shall not be deemed satisfied until such Rent and other amounts have been actually received by Landlord.

B.     All payments required to be made by Landlord to Tenant hereunder shall be payable to Tenant at the address hereinbelow set forth, or at such other address within the continental United States as Tenant may specify from time to time by written notice delivered in accordance herewith. Landlord's obligations to pay any amounts to Tenant under the terms of this Lease shall not be deemed satisfied until such amounts have been actually received by Tenant.

C.     Any notice or document required or permitted to be delivered hereunder shall be deemed to be delivered whether actually received or not when deposited in the United States Mail, postage prepaid, Certified or Registered Mail, addressed to the parties hereto at the respective addresses set out below, or at such other address as they have theretofore specified by written notice delivered in accordance herewith:

| LANDLORD: | TENANT: |
|---|---|
| 3333 Canal Street, LLC<br>C/O Easton, Sanderson & Company<br>300 E. State Street, #G<br>Jacksonville, Florida 32202 | Roofing Supply Group – Tampa, LLC<br>Attention: Legal<br>3890 W. Northwest Highway<br>Suite 400<br>Dallas, Texas 75220<br><br>WITH COPY TO TENANT AT THE PREMISES |

If and when included within the term "Landlord", as used in this instrument, there are more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such a notice specifying some individual at some specific address for the receipt of notices and payments to Landlord; if and when included within the term "Tenant", as used in this instrument, there are more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such a notice specifying some individual at some specific address within the continental United States for the receipt of notices and payments to Tenant. All parties included within the terms "Landlord" and "Tenant", respectively, shall be bound by notices given in accordance with the provisions of this Section to the same effect as if each had received such notice.

24.     HAZARDOUS MATERIALS

A.     For purposes of this paragraph, "Hazardous Materials" shall include all solid, liquid or gaseous materials defined or regulated as wastes under any federal statute or regulation or any state or local law, regulation or ordinance and shall further include all other substances defined or regulated as pollutants or as hazardous, toxic, infectious, or

- 12 -

radioactive substances under any federal statute or regulation or any state or local law, regulation or ordinance, all as amended from time to time,

B.    Tenant shall not cause or permit any Hazardous Materials to be used, generated, stored or disposed of on, under or about, or transported to or from the Premises (collectively, "Hazardous Materials Activities") except in compliance with all applicable federal, state, and local laws, regulations, ordinances and orders governing such Hazardous Materials or Hazardous Materials Activities, which compliance shall be at Tenant's sole cost and expense. Additionally, Tenant shall not cause or permit any Hazardous Materials to be disposed of on, under or about the Premises without the express prior written consent of the Landlord, which may be withheld for any reason and may be revoked at any time. Notwithstanding the foregoing, however, Tenant shall have the right, without Landlord's approval, to use at and to store upon the Premises cleaning products, office supplies and building materials used or sold in the ordinary course of Tenant's business at the Premises, so long as such materials are used, kept and disposed of in compliance with applicable laws. In addition, notwithstanding anything seemingly to the contrary in this Lease, Landlord acknowledges that Tenant shall have no liability or responsibility whatsoever for any Hazardous Materials present and/or discovered at the Premises or any other location within the Building prior to the date Landlord delivers possession of the Premises to Tenant, or on or after such date if not placed there by Tenant or any party for whom Tenant is legally responsible. Furthermore, Landlord shall indemnify, defend and hold Tenant harmless from any claims, damages, fines, penalties, losses, judgments, costs and liabilities arising out of or related to any Hazardous Materials

Activities conducted or permitted on, under or about the Premises which existed prior to Tenant's occupancy of the Premises or which were conducted or permitted by Landlord or by Landlord's employees, agents, contractors, licensees or invitees or other tenants of the Building. The provisions of this Section shall survive the expiration or termination of this Lease.

C.    Landlord shall not be liable to Tenant or to any other party for any Hazardous Materials Activities conducted or permitted on, under or about the Premises by Tenant or by Tenant's employees, agents, contractors, licensees or invitees, and Tenant shall indemnify, defend and hold Landlord harmless from any claims, damages, fines, penalties, losses, judgments, costs and liabilities arising out of or related to any Hazardous Materials Activities conducted or permitted on, under or about the Premises by Tenant or by Tenant's employees, agents, contractors, licensees or invitees, regardless of whether Landlord shall have consented to, approved of, participated in or had notice of such Hazardous Materials Activities. The provisions of this Section shall survive the expiration or termination of this Lease.

D.    At the expiration or earlier termination of this Lease, Tenant shall remove from the Premises, at Tenant's sole expense, all Hazardous Materials located, stored and disposed of on, under or about the Premises by Tenant or by any party for whom Tenant is legally responsible. Tenant shall close, remove or otherwise render safe, in the manner required by all applicable laws, regulations, ordinances or orders, any buildings, tanks, containers or other facilities related to the Hazardous Materials Activities conducted or permitted on the Premises by Tenant or by any party for whom Tenant is legally responsible.

E.    Landlord represents that (i) it has not stored or disposed of any Hazardous Materials on or about the Premises; (ii) the Premises are free from Hazardous Materials as of the Commencement Date; and (iii) the Premises is not, nor has it been, subject to any state or federal remediation plan for Hazardous Materials.

F.    Landlord acknowledges and agrees that if any governmental authority having jurisdiction over the Premises requires (or would require) that remedial action be taken with regard to any Hazardous Materials, it will be Landlord's responsibility to complete and/or commence and diligently prosecute such remedial/abatement action promptly after its receipt of written notice of the need for the same from such governmental authority and/or Tenant in no event beyond any deadline(s) established by such governmental authority, unless such Hazardous Materials were placed there by Tenant or any party for whom Tenant is legally responsible. In the event of any breach of Landlord's agreement set forth in the preceding sentence (provided the required notice was given), and in addition to any other right or remedy Tenant may have at law or in equity or under this Lease, Tenant shall have the right, but not the obligation, to terminate this Lease by written notice to Landlord or to take any commercially reasonable remedial and/or abatement action it deems necessary, at Landlord's sole cost and expense, and to deduct the reasonable amount thereof from its next accruing Rent payment(s). Landlord agrees to indemnify and hold Tenant harmless from and against any and all loss, cost, expense and/or damage (including reasonable attorney's fees and court costs) that Tenant may incur as a result of any such remedial/abatement action.

- 13 -

25.  FORCE MAJEURE. In the event that a party is unable to perform any of its obligations under this Lease by reason of strike, lockout, inability to procure materials, adverse weather conditions, restrictive laws, riot, insurrection, war or other similar events (each, a "Force Majeure Event"), all obligations of the affected party under this Lease shall be immediately suspended, provided that the affected party promptly gives the other party notice of the occurrence of the Force Majeure Event. The affected party shall make its best efforts to eliminate the obstacle(s) preventing its performance. Upon cessation of any Force Majeure Event, this Lease shall continue in full force and effect and each party shall resume its performance under the Lease as soon as possible. If a Force Majeure Event asserted as a basis of a party's nonperformance continues to prevent performance for a period of ninety (90) days, the other party may terminate this Lease by giving written notice to the non-performing party before the nonperforming party resumes performance.

26.  MISCELLANEOUS.

A.  Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.

B.  The terms, provisions and covenants and conditions contained in this Lease shall apply to, inure to the benefit of, and be binding upon the parties hereto and upon their respective heirs, legal representatives, successors and permitted assigns, except as otherwise herein expressly provided. Landlord shall have the right to assign any of its rights and obligations under this Lease. Each party agrees to furnish to the other, promptly upon demand, a corporate resolution, proof of due authorization by partners, or other appropriate documentation evidencing the due authorization of such party to enter into this Lease.

C.  The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way effect the interpretation of this Lease.

D.  Tenant agrees from time to time within ten (10) days after written request of Landlord, to deliver to Landlord, or Landlord's designee a certificate of occupancy (if applicable) and an estoppel certificate stating, if true, that this Lease is in full force and effect, the date to which Rent has been paid, the unexpired Term of this Lease and such other matters pertaining to this Lease as may be reasonably requested by Landlord. It is understood and agreed that Tenant's obligation to furnish such estoppel certificates in a timely fashion is a material inducement for Landlord's execution of this Lease.

E.  Tenant may record a memorandum of lease in the real property records of the county in which the Property is located so that legal notice is provided to all persons of Tenant's interest in the Property.

F.  This Lease may not be altered, changed or amended except by an instrument in writing signed by both parties hereto.

G.  If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the term of this Lease, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added as a part of this Lease contract a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

H.  Because the Premises are on the open market and are presently being shown, this Lease shall be treated as an offer with the Premises being subject to prior leases and such offers subject to withdrawal or nonacceptance by Landlord or to other use of the Premises without notice, and this Lease shall not be valid or binding unless and until accepted by Landlord in writing and a fully executed copy delivered to both parties hereto.

I.  All references in this Lease to the "Effective Date" hereof or similar references shall be deemed to refer to the last date, in point of time, on which all parties hereto have executed this Lease.

J.  Time is of the essence of this Lease and all of its provisions. This Lease in all respects shall be governed by the laws of the State of Florida.

- 14 -

27.    CONSENTS/APPROVALS.  Wherever by the terms of this Lease it is specifically provided that Landlord's consent or approval is required before Tenant may do any act or thing otherwise requested by Tenant, Landlord covenants that it will not unreasonably withhold or delay such consent or approval.

28.    LANDLORD'S REPRESENTATIONS.  Landlord covenants, warrants and represents that: (a) each individual executing, attesting and/or delivering this Lease on behalf of Landlord is authorized to do so on behalf of Landlord; (b) this Lease is binding upon and enforceable against Landlord; (c) Landlord is duly organized and legally existing in the state of its organization and is qualified to do business in the state in which the Premises are located; (d) the zoning designation of the Property allows Tenant's intended use of the Premises for the operation of a building materials distribution business; and (e) there are no covenants, conditions, restrictions (including without limitation any restrictions or other requirements imposed by applicable building codes or other ordinances) or other encumbrances affecting the Property that would prohibit Tenant's use of the Premises for the operation of a building materials distribution business.  In the event that any covenant, condition, restriction (including without limitation any restrictions or other requirements imposed by applicable building codes or other ordinances) or other encumbrance affecting the Property (including without limitation any required approvals by an architectural control committee or similar body) would have the effect of prohibiting Tenant's use of the Premises for the operation of a building materials distribution business, then Tenant, in addition to any other remedy available at law or in equity, shall have the right to terminate this Lease upon written notice to Landlord.  In addition, from and after the Effective Date, Landlord will defend, indemnify and hold harmless Tenant and its representatives, directors, stockholders, officers, employees, agents, successors and assigns (collectively, the "Tenant Indemnified Persons") from and against any and all liabilities, losses, claims, fines, penalties, damages, costs and expenses (including without limitation reasonable attorneys' fees) ("Damages"), incurred by the Tenant Indemnified Persons, directly or indirectly, from or in connection with any breach as of the Effective Date of any of the foregoing representations or warranties made by Landlord in this Lease.  The indemnity obligations of Landlord under this Paragraph 28 shall survive any termination of this Lease.

29.    BROKERS' COMMISSIONS.  Landlord shall pay to Phoenix Realty/Transwestern, and to Easton, Sanderson & Company (collectively, the "Brokers") commissions as follows: (A) Upon execution of the Lease by both Landlord and Tenant, a 4.5% commission payable to Phoenix Realty/Transwestern said commissions to be divided among them in accordance with the terms of a separate written agreement between them and a 1.5% commission payable to Easton, Sanderson & Company; (B) Upon Tenant's exercise of its option to renew and extend the Lease for the First Renewal Term, a 4% renewal commission payable to Phoenix Realty/Transwestern said renewal commissions to be divided among them in accordance with the terms of a separate written agreement between them; and (C) Upon Tenant's exercise of its option to renew and extend the Lease for the Second Renewal Term, a 4% renewal commission payable to Phoenix Realty/Transwestern said renewal commissions to be divided among them in accordance with the terms of a separate written agreement between them.  Landlord and Tenant mutually represent to one another that no brokers have been involved in this transaction except for the Brokers as set forth in the preceding sentence.  Landlord and Tenant agree that, if any agent or broker other than the Brokers identified above shall make a claim for a commission or fee, then the party who retained any such other broker shall be responsible for payment thereof, and such party shall indemnify and hold the other party harmless from such claim for a commission or fee.

30.    PARKING.  Throughout the Term, Tenant and its employees, agents, contractors and invitees shall have the right to use all open surface passenger car parking spaces situated on the Property.  During the Term, there shall be no charge for such parking spaces.

31.    USE OF EXISTING WIRING.  During the Term, Tenant shall have the right to use, without charge therefor, all existing (as of the Commencement Date) data, phone or other wiring within the Building.

32.    RADON DISCLOSURE.  The following notification is required by Florida law and is provided for Tenant's information:

"Radon is a naturally occurring radioactive gas that when it is accumulated in buildings in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed Federal and State guidelines have been found in buildings in Florida. Additional information may be obtained from your county public health unit."

- 15 -

Landlord has not tested for Radon gas on the Premises and therefore makes no representation regarding the presence or absence of such gas. Tenant hereby waives any and all actions against the Landlord related to the presence of such gas; provided, however, that Tenant shall have a right to terminate this Lease should Radon gas be determined to be on the Premises in sufficient quantities to pose a health risk and provided further that nothing in this Section 32 shall limit Landlord's responsibility to remediate the Premises in accordance with Section 24 above.

31.    **USE OF COMMON AREAS.** During the Term, Tenant shall have the non-exclusive right in common with such other tenants to whom Landlord has granted or may grant such rights to use the Common Areas. Tenant shall abide by rules and regulations adopted by Landlord from time to time and shall use its best efforts to cause its employees, contractors, and invitees to comply with those rules and regulations, and not interfere with the use of Common Areas by others.

32.    **RIGHT OF FIRST REFUSAL.** During the Term, Tenant shall have an ongoing right of first refusal (the "Right of First Refusal") to lease the remainder of the Building (the "Additional Space"). Should Landlord decide to lease the Additional Space during the Term of Tenant's right of first refusal to any person other than a lessee then occupying the Additional Space, Landlord shall notify Tenant of the terms on which Landlord is willing to lease the Additional Space. Tenant shall have the option for a period of ten (10) days after receiving written notice to enter into a lease agreement for the Additional Space on terms stated in the notice. Should Tenant fail to exercise the option within the option period, Landlord shall have the right to lease the Additional Space to a third party on the same terms stated in the notice to Tenant. Any lease on different terms reinstates Tenant's right of first refusal.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.
SIGNATURE PAGES FOLLOW.]

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Lease, to be effective as of the Effective Date.

EXECUTED BY LANDLORD this _17_ day of July, 2013.

LANDLORD:

3333 Canal Street, LLC,
a Florida limited liability company

By: _____
Name: Samuel M. Easton, Jr.
Title:   Managing Member

- 16 -

EXECUTED BY TENANT this ___26th___ day of July, 2013.

TENANT:

Roofing Supply Group - Tampa, LLC, a
Delaware limited liability company

By: _Mary-Knight Tyler_
Name: _Mary Knight Tyler_____ Title: _CFO_

- 17 -

**EXHIBIT A**

Legal Description of the Property

[To be Attached by Landlord]

1

**EXHIBIT B**

Landlord's Work

1. Clear trees along fence line;
2. Add 16' Concrete ramp and cut out door 16' x 10';
3. New roll up door;
4. Pressure wash sidewalks, spray wasps, clean up, get Premises into move-in condition; and 5. Install A/C in the showroom area (12 of 15 years of useful life allocated to Landlord expenses).


Tenant Improvements to be performed by Landlord subject to combined Tenant Allowance of $46,860:

1. Add 8' chain link fence to secure property;
2. Remodel office and showroom according to Kevin Crawford's specs;
3. Install/replace carpet and vct tile according to Tenant's specs; and
4. Install A/C in the showroom area (3 of 15 years useful life allocated to Tenant Allowance).

## LANDLORD WAIVER AND CONSENT AGREEMENT

This LANDLORD WAIVER AND CONSENT AGREEMENT (this "Agreement") is dated as of and entered into by 3333 CANAL STREET, LLC ("Landlord"), to and for the benefit of DEUTSCHE BANK TRUST COMPANY AMERICAS ("DBTCA"), as Collateral Agent for the Secured Creditors (as defined below) (in such capacity and together with any successor thereto, the "Collateral Agent"). Unless otherwise defined herein, all capitalized used herein and defined in the Credit Agreement referred to below shall be used herein as therein defined.

### RECITALS:

WHEREAS, Landlord is the record title holder and owner of certain real property located at 3333 Canal Street, Jacksonville, Florida (the "Real Property");

WHEREAS, Roofing Supply Group - Tampa, LLC, a Delaware limited liability company ("Tenant"), has possession of and occupies all or a portion of the Real Property (the "Premises");

WHEREAS, Tenant's interest in the Premises arises under the lease agreement (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Lease") more particularly described on Exhibit A annexed hereto, to which Landlord and Tenant are a party;

WHEREAS, reference is made to that certain Credit Agreement, dated as of May 31, 2012 (as amended, modified, restated and/or supplemented and in effect from time to time, the "Credit Agreement"; CDRR MS, Inc. (a Delaware corporation that has been merged with Roofing Supply Group Holdings, Inc., a Delaware corporation that has been merged with Roofing Supply Group, LLC, a Delaware limited liability company, the lenders party thereto from time to time (the "Lenders"), DBTCA, as Collateral Agent and as administrative agent (together with any successor administrative agent, the "Administrative Agent" and, together with the Collateral Agent, each Issuing Lender under the Credit Agreement, each Joint Lead Arranger and the Lenders, the "Lender Creditors"), pursuant to which Tenant has executed a security agreement, mortgages, deeds of trust, deeds to secure debt and assignments of rents and leases, and other collateral documents in relation to the Credit Agreement;

WHEREAS, the Borrowers or Guarantors have entered into, or may from time to time after the date hereof enter into, one or more Interest Rate Protection Agreements or Permitted Hedging Arrangements, entered into with any Hedging Affiliate (collectively, the "Secured Hedging Creditors");

WHEREAS, the Borrowers or Guarantors have entered into or from time to time after the date hereof will enter into one or more Bank Products Agreements, entered into with any Bank Products Affiliate (collectively, the "Treasury Services Creditors" and, together with the Lender Creditors and the Secured Hedging Creditors, the "Secured Creditors");

WHEREAS, Tenant's repayment of (or guaranty of) the extensions of credit made by the Secured Creditors under the Credit Agreement (and/or any other (a) Loan Document (b) Interest Rate Protection Agreement, (c) Permitted Hedging Arrangement, or (d) Bank Products Agreement ((b), (c) and (d), collectively, the "Secured Hedging Agreements"), and together with (a) and the Credit Agreement, the "Secured Debt Agreements") will be secured, in part, by all of the following now or hereafter located on the Premises, (i) inventory of Tenant, (ii) all equipment, machinery and trade fixtures used in Tenant's business, (iii) all leasehold improvements of Tenant, (iv) all furniture and all other personal property of Tenant and (v) all proceeds of the foregoing (the "Collateral"); and

WHEREAS, the Collateral Agent has requested that Landlord execute this Agreement as a requirement under the Credit Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and for so long as the obligations under the Credit Agreement and Secured Hedging Agreements remain outstanding, Landlord hereby represents and warrants to, and covenants and agrees with, the Collateral Agent as follows:

Page 2

NEWYORK 8632251 v2 (2K)

1.    Landlord Lien. (a) Landlord hereby (i) waives and releases unto the Collateral Agent and its successors and assigns any and all security interests created by statute, contract (including the Lease) or by common law and any and all rights granted by or under any present or future laws to levy or distraint for rent or any other charges which may be due to Landlord against the Collateral, and any and all other claims, liens and demands of every kind which it now has or may hereafter have against the Collateral (including, without limitation, any right to include the Collateral in any secured financing that Landlord may become a party to), and (ii) agrees that any rights it may have in or to the Collateral, no matter how arising (to the extent not effectively waived pursuant to clause (a)(i) of this paragraph 1), shall be subordinate to the rights of the Collateral Agent in respect thereof. Landlord acknowledges that the Collateral is and will remain personal property and not fixtures or part of the underlying real estate even though it may be affixed to or placed on the Premises.

(b) Landlord further agrees not to assert any claim to the Collateral while Tenant is indebted under (or in respect of) the Credit Agreement or any other Secured Debt Agreement. Landlord acknowledges that the Collateral Agent shall have a first priority security interest in the Collateral and that the Collateral Agent shall have the right to file and record Uniform Commercial Code financing statements against the Collateral.

2.    Nature of Collateral. The Collateral may be installed in or located on the Premises and is not and shall not be deemed to be a fixture or part of the underlying real estate but shall at all times be considered personal property.

3.    Status of Lease. Landlord certifies that (a) Landlord is the landlord under the Lease, (b) the Lease is in full force and effect and has not been amended, modified, or supplemented except as set forth on Exhibit A annexed hereto, (c) to the knowledge of Landlord, there is no defense, offset, claim or counterclaim by or in favor of Landlord against Tenant under the Lease or against the obligations of Landlord under the Lease, (d) no notice of default has been given under or in connection with the Lease which has not been cured, and Landlord has no knowledge of the occurrence of any other default under or in connection with the Lease, and (e) except as disclosed to Collateral Agent, no portion of the Premises is encumbered in any way by any deed of trust or mortgage lien or ground or superior lease.

4.    Collateral Agent's Access. (a) Landlord agrees that while the Lease is in effect (including during any extension or renewal periods) it will not prevent the Collateral Agent or its designees from entering upon the Premises at all reasonable times to inspect, appraise or remove the Collateral.

(b)    In the event that Landlord either deems itself entitled to redeem or take possession of the Premises during the term of the Lease or intends to terminate the Lease prior to the expiration of the term thereof due to a default of Tenant thereunder, Landlord will deliver notice (the "Termination Notice") to the Collateral Agent to that effect not less than twenty (20) days before taking such action. Landlord agrees that within the 90-day period after the Collateral Agent receives the Termination Notice (the "Disposition Period"), the Collateral Agent shall have the right, but not the obligation, to enter upon and into the Premises for the purpose of assembling, repossessing, appraising, displaying, removing, preparing for sale or lease, repairing, transferring, selling (at public or private sale) or otherwise dealing with the Collateral. Landlord further agrees that during the Disposition Period, Landlord will not interfere with the Collateral Agent's actions in removing the Collateral from the Premises or such other of the Collateral Agent's actions in otherwise enforcing its security interest in the Collateral. Notwithstanding anything to the contrary in this paragraph, Landlord acknowledges that the Collateral Agent shall at no time have any obligation to remove the Collateral from the Premises. The Collateral Agent shall not be liable for any diminution in value of the Premises caused by the absence of the Collateral actually removed or by the need to replace the Collateral after such removal. For the actual period of occupancy by Collateral Agent during the Disposition Period, Landlord will pay to Landlord a fee equal to the basic rent required to be paid under the Lease by tenant as if the Lease were in full force and effect, pro rated on a per diem basis based on a 30 day month.

(c)    In entering upon or into the Premises under either clause (a) or (b) set forth above of this paragraph 4, the Collateral Agent hereby agrees to indemnify, defend and hold Landlord harmless from and against any and all claims, judgments, liabilities, costs and expenses incurred by Landlord and caused solely by the Collateral Agent entering upon or into the Premises and taking any of the foregoing actions with respect to the Collateral. Such costs shall include any damage to the Premises made by the Collateral Agent in severing and/or removing the Collateral therefrom and taking any of the foregoing actions with respect to the Collateral. Additionally, the Collateral Agent

Page 3

shall repair, at its sole cost and expense, any physical damage to the Premises actually caused by the Collateral Agent's taking any of the foregoing actions with respect to the Collateral.

5.    Default Notices.  Landlord shall send to the Collateral Agent a copy of any notice of default under the Lease sent by Landlord to Tenant (the "Default Notice").  Any Default Notice shall state the nature of the default and shall specify the amounts of rent or other payments provided for that are claimed to be in default.

6.    Default and Cure Rights.  Notwithstanding anything to the contrary contained in the Lease, and without thereby assuming Tenant's obligations under the Lease, in the event of a default by Tenant under the Lease, Collateral Agent shall have the right, but not the obligation, to cure any such default(s) within the later of (a) thirty (30) days following receipt of a Default Notice, and (b) the last day of the cure period available to Tenant under the terms of the Lease (except with respect to payment default(s), which cure must be made within the later of (i) fifteen (15) days following receipt of a Default Notice, and (ii) the last day of the cure period available to Tenant under the terms of the Lease with respect to payment default(s)); provided, however, that if a non-monetary default cannot reasonably be cured by the Collateral Agent within such thirty (30) day period, the Collateral Agent shall have such additional period of time as shall be reasonably necessary (at Landlord's reasonable discretion) to cure such non-monetary default so long as the Collateral Agent commences such curative measures within such thirty (30) day period and thereafter proceeds diligently to complete such curative measures.

7.    Estoppel Certificate.  Within fifteen (15) days after written request therefor from the Collateral Agent, but no more frequently than two (2) times per any twelve (12) month period Landlord shall deliver to such Collateral Agent an estoppel certificate signed by Landlord in form reasonably designated by the Collateral Agent that certifies as to: (a) the rent payable under the Lease; (b) the term of the Lease and the rights of Tenant, if any, to extend the term of the Lease; (c) the nature of any defaults by Tenant alleged by Landlord; and (d) any other matters reasonably requested by the Collateral Agent.

      8 Delivery of Notices.  All notices to the Collateral Agent under this Agreement shall be in writing and sent to the Collateral Agent by telefacsimile, by United States certified mail, return receipt requested, or by overnight delivery service at the address set forth on the signature page to this Agreement.

9..    Governing Law.  This Agreement and the rights and obligations of the parties hereunder shall be governed by, and shall be construed and enforced in accordance with, the laws of the State in which the Premises are located, without regard to conflicts of laws principles.

10.    Successors and Assigns.  The terms and provisions of this Agreement shall inure to the benefit of and be binding upon the successor and assigns of Landlord (including any successor owner of the Real Property) and the Collateral Agent.  Landlord will disclose the terms and conditions of this Agreement to any purchaser or successor to Landlord's interest in the Premises.

11.    Amendments.  This Agreement may not be changed or terminated orally and is binding upon, and inures to the benefit of, the parties hereto and each of their respective successors and assigns.  Landlord will disclose the terms and provisions of this Agreement to any purchaser or successor to Landlord's interest in the Premises.

12.    Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, but together the counterparts shall constitute one and the same document.

13.    Credit Agreement, Secured Hedging Agreement.  The Secured Creditors may, without in any way affecting or limiting this Agreement, and without notice to Landlord, modify, supplement, restate (in whole or in part) or refinance any Credit Agreement or any Secured Hedging Agreement.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed and delivered as of the day and year first set forth above.

NEWYORK 6572251 v2 (2K)

Page 4

3333 CANAL STREET, LLC

By: _____
Name: Samuel M. Easton, Jr.
Title: Managing Member

3333 Canal Street, LLC
    C/O Easton, Sanderson & Company
300 E. State Street, #G
Jacksonville, Florida 32202

Address:    Collateral Agent:

60 Wall Street  DEUTSCHE BANK TRUST COMPANY AMERICAS
New York, NY 10005-2858
Attention: Michael Getz By:_____  Telephone No.:  212-250-2640
Name: Telecopier No.: 212-797-5692 Title:

By:_____ Name:
Title:

EXHIBIT A TO
LANDLORD WAIVER AND CONSENT

Description of Lease (including any amendments thereto and assignments thereof):

*Lease Agreement between 3333 Canal Street, LLC and Roofing Supply Group - Tampa, LLC dated July ___, 2013 (the "Lease")*

EXHIBIT B

 **Beacon Roofing Supply, Inc.**
Office of the General Counsel

A Corporation of Regional
Suppliers of Quality Roofing
and Building Materials
In North America

Ross D. Cooper
Executive Vice President, General Counsel & Secretary
(301) 272-2123 (Direct)
(301)272-2125 (Facsimile)
rcooper@becn.com

July 20, 2016

**VIA ELECTRONIC MAIL ONLY**

3333 Canal Street, LLC
C/O Eastern, Sanderson & Company
Attn: Samuel M. Easton, Jr.
300 E. State Street, # G
Jacksonville, FL 32202

Re:    <u>Lease Extension and Amendment for 3333 Canal Street – Jacksonville, Florida
32209 ("Lease")</u>

Dear Mr. Easton:

I write on behalf of Beacon Sales Acquisition Inc., d/b/a Roofing Supply Group ("Tenant"),
regarding the Lease for the above-referenced property ("Lease") between Tenant and 3333 Canal
Street, LLC ("Landlord"). Capitalized terms herein have the same meaning as in the Lease. Further
to your conversations with Rick Damato, this will confirm the parties have agreed to extend the
Lease Term for five (5) years, beginning October 12, 2016 and expiring October 11, 2021
("Extended Term").

The rental payments for the Extended Term are as follows:

10/12/2016 through 10/11/2017 – $13,526.48 per month
10/12/2017 through 10/11/2018 – $13,797.00 per month
10/12/2018 through 10/11/2019 – $14,072.95 per month
10/12/2019 through 10/11/2020 – $14,354.41 per month
10/12/2020 through 10/11/2021 – $14,641.50 per month

In exchange for extending the term of the Lease, Landlord shall complete the T5 lighting
upgrade identified in the box labeled "Landlord Improvements" on the bid in Exhibit A, attached
hereto ("Improvements"). Landlord shall contract for and facilitate the Improvements. All work
shall be to Tenant's commercially reasonable satisfaction. The Improvements shall be completed no
later than December 31, 2016 (the "Completion Date"). Upon completion of the Improvements,

Samuel M. Easton, Jr.
July 20, 2016
Page 2

Tenant shall reimburse Landlord one half of Landlord's cost to complete the work up to a maximum amount of $5,000 within thirty (30) days after receipt of all invoices and lien waivers with respect to work from Landlord. If requested by Landlord, Tenant shall make payment directly to the account of the contractor, subcontractor, materialman, surveyor, architect or other person performing labor or services or delivering materials related to the completion of the Improvements. If the Improvements are not completed by the Completion Date, Tenant may elect to complete the Improvements itself and deduct the reasonable cost thereof from the monthly rent. Tenant shall provide Landlord with paid invoices for any Improvements which it undertakes within thirty (30) days after completion of the work.

Further, Tenant preserves both renewal options pursuant to Section 1B of the Lease, as amended herein. Each option is hereby amended to be for a Renewal Term of five (5) years. Section 2B and 2C setting forth Base Rent for each Renewal Term are hereby deleted. Base Rent for each year of each Renewal Term shall increase from the prior Term year by 2%.

In addition, Tenant's address set forth in Section 23C "Notices" of the Lease, is replaced and will mean the Premises address c/o Branch Manager, with a copy by overnight mail to Ross D. Cooper, Executive Vice President and General Counsel, Beacon Sales Acquisition, Inc., 5244 River Road, Second Floor, Bethesda, MD 20816.

Pursuant to Section 29 of the Lease, Tenant shall not be responsible for any broker commissions resulting from this Lease Extension and Amendment.

Except as set forth herein, all other terms and conditions of the Lease shall remain in full force and effect.

Please indicate your agreement by signing and returning this letter to me by PDF email at the contact information listed above. Thank you for your cooperation.

Sincerely,

Ross D. Cooper

AGREED:
3333 Canal Street, LLC

By: _____
Samuel M. Easton, Jr.
Its: Managing Member

Date: 7-21-16

EXHIBIT   C



Easton, Sanderson and Company    300 East State Street / Jacksonville, FL 32207 (904) 356-2228 / FAX (904) 634-4953
Registered Real Estate Broker

Date:    1/22/2019

To:    Sgarber@becn.com

From:    Easton, Sanderson & Company

Re:    Beacon Sales Lease

We now have thoroughly reviewed the Beacon file with 2 different Real Estate litigators. Some of our thoughts and comments are...

1.    There is a mutual mistake on both parties with incorrect figures being inserted on your end and an oversight on our part not checking the figures before signing.

2.    Your record of paying the correct monthly amount for 2 years is huge in their eyes.

3.    These litigators indicate a local judge or jury is not going to let a fortune 500 company bully a small local Real Estate firm.

Again, the original lease you asked for was 50,000 s.f. but we gave you 87,200 s.f. for the price of 50,000 s.f. (original 3 years). When the lease was renewed for 5 years starting 10-12-16 it was supposed to be $2.50/s.f. gross for 87,200 s.f. and 2% annual increases which would be $2.65/s.f. gross in 2019. We think Rick Damato was confused, he probably had never been to the site to see how it lays out. The 2 page renewal letter does not even have the square footage on it. Also, the attorneys said there is case law in Florida that a letter/extension does not constitute a lease.

The last thing both of us want is an expensive legal battle that would become unfriendly, where the only winners are the attorneys. If we won, your rent would immediately go to market rent which is now approximately $3.95/s.f. rent plus $1.20/s.f. cam, you are paying $1.94/s.f. now and our cam is $1.20/s.f. We have the Real Estate Broker that put you in the space on our side and 3 other roofing suppliers that lease from us are willing to testify what they pay in rent now.

We offer a compromise...

Beacon Sales pays $2.65/s.f. gross on 87,200 s.f. starting February 2019 and stay fixed through your first term to 10-11-21. We have spent $71,640 getting you into the space in 2013 and another $41,500 in 2018 on a required fire pump. We hope you understand our situation and will agree to work this out with us!

Wayne Sanderson

EXHIBIT  D

4/15/2021                                    Lease Renewal – Beacon Sales – 3333 Canal        Jacksonville, FL

## Lease Renewal - Beacon Sales - 3333 Canal St. Jacksonville, FL

From:   Wayne Sanderson <wsanderson@escresults.com>
Sent:   Mon, Feb 8, 2021 at 9:59 am
To:     cherise.fleming@mohrpartners.com
Cc:     seaston@escresults.com

img-0.png (6.2 KB)     Untitled_02082021_093928.pdf (1.2 MB)   – Download all

Good morning Cherise,

Thank you for your inquiry for the Beacon Sales renewal. We did not get their 90 day required notice to renew.

Our industrial market has exploded with a 2.4% vacancy rate (soon to be 5.5% vacancy with 16 new warehouses coming on the market) and an average rent up from $6.62/s.f. to $7.03/s.f. NNN.

We are willing to...

| | | |
|---|---|---|
| Lease to Beacon Sales for | $3.80/s.f. NNN | |
| | + $0.84/s.f. CAM | |
| | $4.64 Total | |
| | + 7% FL Sales Tax | |
| On 87,200 s.f. | with 2% annual increases! | |

Average NNN rents for this type of space in Jacksonville is $4.50 to $5.50/s.f. NNN. This rate is well below the market for this nice warehouse with a new roof, new T-5 lights, new fire pump for the sprinkler system (required for roofing material), and a great one acre paved outside storage area with 140sf out building.

| This makes the rental rate | $27,613 | Rent |
|---|---|---|
| | + $6,104 | CAM |
| | $33,717 | Sub Total |
| | + $2,360 | Sales Tax |
| | $36,077 | Monthly Total |

2% leasing commission to Mohr Partners.
We have a $12,500 security deposit on hand.

Please give me a call at the number below if you have any questions!
See backup attachments.......

Thanks,

Wayne Sanderson, VP CCIM, CPM
Easton, Sanderson & Company
Commercial/Industrial Real Estate
300 East State Street, Suite G
Jacksonville, FL 32202
Wsanderson@escresults.com
(904) 356-2228 Office
(904) 521-8840 Cell
(904) 634-4953 Fax